# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| Z.G., a minor, by his parents,<br>Jennyfer Sordillo and Robert Groezinger,<br>    Plaintiff,<br><br>v.<br><br>CARVER SCHOOL DEPARTMENT, CHRISTINE CABRAL, individually and in her capacity as Assistant Principal of Carver Middle High School, SCOTT KNIEF, individually and in his official capacity as Principal of Carver Middle High School, and ELIZABETH SORRELL, individually and in her official capacity as Superintendent of Carver Public Schools,<br>    Defendants. | C.A. No. _____ |

**COMPLAINT, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND JURY DEMAND**

## I. INTRODUCTION

1. Z.G. is a thirteen year-old boy at Carver Middle High School who has been harassed and bullied for two years because he is Jewish. The Defendants are the school officials and government body in the Town of Carver who have done nothing to stop it. On a daily basis, a group of boys assault Z.G. with derogatory slurs like "Stingy Jew", Nazi salutes, and physical abuse. While the Defendants have occasionally punished the bullies for their violent acts, they have done nothing to address the pervasive religious harassment underlying the behavior, despite repeated complaints by Z.G.'s parents about the anti-Semitic attacks. Recently, criminal charges were filed against two of Z.G.'s abusers for assault and battery and civil rights offenses. The charges underscore the Defendants' willful disregard for Z.G.'s wellbeing. Such disregard amounts to nothing less than a violation of Z.G.'s constitutional right to equal protection under the law regardless of religious affiliation. This Court's intervention is required.

## II. PARTIES

2.      Z.G. is entering the eighth grade at Carver Middle High School, a resident of Carver, Massachusetts, and Jewish.

3.      The Carver School Department is a government subdivision within the Town of Carver that operates the Carver Public Schools and Carver Middle High School.

4.      Christine Cabral is the Assistant Principal of Carver Middle High School and, upon information and belief, responsible for the overall day-to-day administration of grades six through eight.

5.      Scott Knief is the Principal of Carver Middle High School (the "Carver Middle High") and responsible for the day-to-day administration of the Carver Middle High.

6.      Elizabeth Sorrel is the Superintendent of Carver Public Schools and responsible for the overall administration of Carver Public Schools.

## III. JURISDICTION

7.      This Court has federal question jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

## IV. FACTS

8.      Z.G. is thirteen years old. He was born in Wareham and raised in the Town of Carver. He loves playing sports, especially basketball and baseball, where he plays three positions: pitcher, catcher, and shortstop. He also loves riding his bike.

9.      Until he entered Carver Middle High, Z.G. enjoyed attending school. He earned good grades, mostly As and Bs, with some Cs. He genuinely looked forward to going to school.

10.     Z.G.'s mother is Jewish, and Z.G. considers himself Jewish. Although he does not keep kosher or attend synagogue regularly,[1] he is fiercely proud of being Jewish. He loves going to Passover meals at his cousins' house and eating matzah ball soup. One of his treasured items is a yarmulke with a Red Sox insignia brought back from Israel by a friend of the family. When he turned thirteen, Z.G. wanted to become a Bar Mitzvah. A family friend offered to train him, but his family did not have the financial means for the celebration.

11.     Z.G. is diminutive, even for his age. He is approximately four feet, ten inches tall and 93 pounds. All the boys who harassed and bullied Z.G. are larger than him, some much so.

12.     In the summer between fifth and sixth grade, Z.G. was playing football near his house once when some older boys, D.H. and M.V., who also wanted to play, tackled him and beat him up. One of the boys said, "That's how you take down a Jew." This was the first time another boy, or anyone for that matter, had harassed Z.G. because he was Jewish, but it would not be the last.

a. Sixth Grade

13.     Z.G. began Carver Middle High School in sixth grade. The school is a combined middle school and high school, with grades six through twelve. Z.G. and his parents are aware of only one other Jewish student in his grade out of approximately 155 students.

14.     Since starting Caver Middle High School, Z.G. has been harassed and bullied every day by a group of about six other boys: J.A., D.H., M.V., S.M., J.D., and R.M. The harassment and bullying focus on one characteristic: that Z.G. is Jewish.

---

[1] When Z.G. has attended synagogue, he went to one in nearby Plymouth, since Carver does not have any synagogues.

15. Every day at school Z.G. is peppered with derogatory slurs by one or more of these boys. The slurs included: "Stingy Jew," "Fucking Jew," "Dirty Jew," "Jew boy," and similar language. This happens in the hallway, in the cafeteria, and sometimes even during class.

16. In addition to the slurs, some of the boys raise their arms while passing by Z.G. in a Heil Hitler salute. More than once, one of the boys told Z.G. that he needed to get in the oven.

17. At all times, the Defendants did nothing to stop the religious harassment of Z.G, despite complaints by Z.G.'s mother, Jennyfer Sordillo, that the harassment focused on Z.G. being Jewish. The Defendants only took action when the harassment and bullying turned into a physical confrontation. As long as the harassment and bullying did not involve actual fights, the Defendants turned a blind eye.

18. Around Halloween during Z.G.'s sixth grade year, Carver Middle High held a social event called Haunted Hallways. Z.G. and his mother, Ms. Sordillo, attended. Since Haunted Hallways is a school function, teachers and school officials attend, some dressing up, some as monitors. While Z.G. was standing by himself for a moment near the school entrance, R.M. and S.M. found him and pulled him away from the door. They pushed him up against a brick wall then onto the ground, hitting him while calling him a variety of derogatory slurs, and then stole his wallet. When Ms. Sordillo found out, she confronted the boys who stole Z.G.'s wallet; they returned the wallet but not the cash inside.

19. The following Monday, Ms. Sordillo visited with Principal Scott Knief to discuss the incident and see what the school would do. Knief told her that the boys had complained that she had assaulted them. He barred her from school events for three months.

20. Z.G. complained to his mother regularly about the harassment and bullying. Ms. Sordillo called the school about the harassment and bullying several times each week while Z.G.

was in the six grade. She initially complained to Assistant Principal Christine Cabral when she called. Each time, Cabral told Ms. Sordillo that she would investigate the issue and get back to her. Usually Cabral failed to get back to Ms. Sordillo; when she did get back to Ms. Sordillo, it would be to inform Ms. Sordillo that Z.G. had a good day, but she never had any information regarding the school's response to the harassment and bullying. Ms. Sordillo eventually gave up trying to work with Cabral and went directly to Principal Scott Knief. Knief told Ms. Sordillo that he would monitor the situation. Ms. Sordillo also attempted to contact Z.G.'s guidance counselor to discuss the harassment, but could only leave messages, which were never returned.

21. Z.G. frequently visited the nurse's station to call his mother during the school day to complain about the harassment and bullying.

b. <u>Seventh Grade</u>

22. In the seventh grade, Z.G.'s bullies found a new methods of harassment: by throwing pennies at him. They threw pennies at Z.G. when they saw him in the hall while calling him "Stingy Jew" and similar slurs in the process. They sometimes told him that they left pennies in the cafeteria and at Cumberland Farms near his house for him to pick up – implying that he would retrieve the pennies because he was Jewish.

23. Most disturbing, the religious harassment of Z.G. occurred in full view of parents, school officials – including but not only Cabral and Knief – and other members of the public.

24. Z.G. attended a varsity basketball game once to watch his brother play. While sitting near the top of the stands, J.A. and another boy, K.B., sat near the bottom of the stands and threw pennies at Z.G. while calling him derogatory slurs. Parents and other students sat in the stands while this occurred and did nothing.

25. During class at least once, J.A. said "stupid Jew" under his breath when Z.G. answered a question incorrectly. The teacher of the class heard the comment but did not say or do anything about it.

26. The religious harassment and bullying of Z.G. in the cafeteria was pervasive during seventh grade. Z.G. told the cafeteria monitors on at least one occasion that the boys were calling him a "dumb Jew" or similar slurs, but the monitors ignored his complaints.

27. After Ms. Sordillo's repeated complaints, Cabral told her that she would personally monitor the cafeteria, or if she was not available, Knief, the principal, or the Athletic Director Mike Schultz, would.

28. However, the Defendants' only actual corrective action regarding the religious harassment and bullying in the cafeteria was to allow Z.G. to eat his lunch in Cabral's office.

29. Frequently during the seventh grade, D.A., S.M., and sometimes J.A. waited for Z.G. at his locker between classes. Sometimes they would slam him against the locker; other times they would call him derogatory slurs and throw pennies at him; many times, they would do both.

30. In gym class one day, J.A. was mocking Z.G. for being on the B team in the town's recreational basketball league (the A team is the more competitive team). J.A. told Z.G.: "They just hate you because you're Jewish." J.A. repeated the harassment throughout the class until he and Z.G. became involved in a fight. At the end, Z.G. – who had a black eye and a bleeding nose – was suspended for three days, and J.A. received no punishment.

31. Carver Middle High annually holds a Spirit Week in the spring. Students are encouraged to wear clothing and dress in a way that displays pride and individuality. Z.G. wore his yarmulke to school one day that week, the one from Israel with the Red Sox insignia. One of

6

his teachers, however, tracked Z.G. down in the hallway and ordered him to remove the yarmulke because she found it offensive; she claimed that other people at school were complaining about it. Z.G. told the teacher that he was Jewish, but she said that did not matter. As a result, Z.G. took off the yarmulke, unhappily.

32. The next day, Ms. Sordillo spoke with the teacher about what happened. She also spoke with Cabral. Neither appreciated that the incident had upset Z.G. and offended Ms. Sordillo. There was no effort by school officials, including the Defendants, to discuss the incident further with Z.G. or Ms. Sordillo, and no apology was offered.

33. In comparison, students at Carver Middle High frequently wear crosses and other religious symbols as articles of clothing or jewelry without controversy.

34. On May 22, 2013, another boy, J.P., began calling Z.G. a "stingy Jew" repeatedly throughout the day. Z.G. had a doctor's appointment that afternoon and complained to his doctor about the harassment.

35. On May 28, 2013, Z.G. was being harassed in the cafeteria as usual, but this time the harassment escalated to include food throwing. J.D. and S.M. tossed chicken nuggets repeatedly at Z.G. from another table. Eventually, Z.G. stood up and confronted J.D. A cafeteria monitor saw this and ordered Z.G. to the principal's office. When Z.G. protested that J.D. had been throwing food and calling him derogatory religious slurs, the monitor sent J.D. and S.M. to the principal's office as well.

36. On his way to the principal's office, Z.G. dropped some books off at his locker. J.D. and S.M. tracked him down. J.D. told Z.G. that he left pennies at Cumberland Farms for him. After knocking Z.G.'s books out of his hands, he pushed Z.G. into his locker and punched

him in the head several times while calling him a "dumb Jew." The beating left Z.G. with a huge welt on the left side of his head, bruises along his temple, and a headache for the rest of the day.

37.   Z.G. went to the nurse's office after the beating. School officials sent him home at the end of the day on the school bus without contacting Ms. Sordillo or Mr. Groezinger. When Z.G. arrived at home, Ms. Sordillo could tell immediately that he had been beat-up by looking at his face. She did not receive a call from the school until 3:30 p.m., when Cabral called her. Cabral explained that she only was in the cafeteria for fifteen minutes that day before she had to leave (despite her previous promise to monitor the cafeteria personally or have Knief or the Athletic Director Mike Schultz do so).

38.   A few weeks after this, Z.G. and Ms. Sordillo found a swastika etched in chalk outside their driveway.

c. The School's Non-Response

39.   The day after Z.G. was assaulted and harassed on May 28, 2013, Ms. Sordillo and her mother initiated a meeting with Cabral. Cabral acknowledged that Z.G. had been bullied but refused to provide any documentation regarding how she or the school intended to respond.

40.   A few weeks later, at a regular meeting regarding Z.G.'s Individualized Educational Program ("IEP"),[2] Knief assured Ms. Sordillo that school officials had met to discuss Z.G.'s harassment and bullying, and that Superintendent Elizabeth Sorrell was notified about the issue. However, he said that school officials considered the issue to concern harassment, not bullying.

41.   The Defendants treat the religious harassment of Z.G. differently than they treat harassment directed against other students. As one example, when a boy named A.T. harassed Z.G. on his bus, calling him "Stingy Jew" and stealing his hat, and Ms. Sordillo informed the bus

---

[2] Z.G. has ADHD and receives an IEP for that reason.

8

driver, A.T. remained on the bus. In comparison, when a white student harassed a black student on the bus with racial slurs, the white student was kicked off the bus for three days.

42. Carver has developed a Bullying Prevention and Intervention Plan as required by M.G.L. c. 71, § 370 (the "Bullying Plan"). The Bullying Plan defines "bullying" as:

> The repeated use by one or more students of a written, verbal, or electronic expression or a physical act or gesture or any combination thereof, directed at another student (a "target"), causing one or more of the following:
>
> - physical or emotional harm to the targeted student or damage to his/her property;
> - placement of the targeted student in reasonable fear of harm to him/herself or of damage to his/her property;
> - a hostile environment at school for the targeted student;
> - infringement on the rights of the targeted student at school; or
> - material and substantial disruption to the educational process or the orderly operation of the school.
>
> Bullying generally involves "picking on" a student over time and may include conduct such as hitting and shoving; pressuring a student into taking an action he/she does not wish to take; words that involve threats, teasing, putdowns, or name-calling; threatening looks, gestures, or actions; cruel rumors; false accusations; and social isolation.

43. The Bullying Plan requires "school or district staff member, or any staff member of a program housed in [school] facilities . . . to report any instance of bullying or retaliation to the principal or designee." The Bullying Plan further states: "The requirement to report to the principal or designee does not limit the authority of the staff member to respond to behavioral or disciplinary incidents consistent with school or district policies and procedures for behavior management and discipline."

44. The Bullying Plan further establishes a list of ways that the school may respond to reports of bullying:

> The principal or designee will take steps to assess the need to restore a sense of safety to the alleged target and/or to protect the alleged target from possible

further incidents. Responses to promote safety may include, but are not be limited to:
- creating a personal safety/action plan;
- pre-determining seating arrangements for the target and/or the aggressor in the classroom, at lunch, or on the bus;
- identifying a staff member who will act as a "safe person" for the target;
- altering the aggressor's schedule and access to the target;
- providing "check-ins" with the target with an adult that has been identified as the "safe person" and/or the principal or designee;
- providing "check-ins" with the target aggressor.

45. The Bullying Plan also requires that "the principal or designee will notify the parents/guardians of the target and the parents/guardians of the aggressor" when the school has determined that bullying occurred. The Bullying Plan further states that "[t]he principal or designee will also notify the parents/guardians of the target what action is being taken to prevent further acts of bullying or retaliation" to the extent permitted by law.

46. The Defendants have responded to the harassment and bullying of Z.G. with any of the steps identified in the Bullying Plan as appropriate responses to bullying.

d. Effect of Harassment on Z.G.

47. Since the religious harassment and bullying began in sixth grade, Z.G.'s grades have dropped. His most recent report card had mostly Cs and Ds.

48. Z.G. has difficulty concentrating in class because he worries about what will happen after class or what was said to him before class. Although Z.G. has been diagnosed previously with ADHD, he received medication for ADHD well before the harassment began, and only began to have increased difficulty in concentration after the harassment started.

49. At various points in the seventh grade, Z.G. commented to Ms. Sordillo that he sometimes wishes he wasn't Jewish. He also hates going to school now. He has said several

times to Ms. Sordillo when she drops him off in the morning how he wished he did not have to go specifically because of the harassment and bullying.

50.     Z.G. did not sign up to play little league baseball this summer because he wanted to avoid the boys who harass him. He still plays recreational basketball, but now plays for a team in another league located in another community. Only one student from Carver is on the team.

### e. Police Action

51.     Since the bullying and harassment of Z.G. started, Ms. Sordillo made numerous reports to the Carver Police Department ("Police Department"). The Defendants, on the other hand, never contacted the Police Department, not even after Z.G. was assaulted on May 28.

52.     Unlike the Defendants, the Police Department takes the bullying and harassment of Z.G. seriously. When Ms. Sordillo contacted the Police Department about the May 28 assault, the police officer with whom she spoke expressed shock that school officials had not alerted the Police Department about the incident.

53.     Recently, the Plymouth County District Attorney's Office and the Office of the Attorney General contacted Ms. Sordillo about Z.G.'s abuse. On or about July 10, 2013, two of the boys, S.M. and J.D., were arraigned on assault and battery and civil rights charges.

## COUNT I

**(42 U.S.C. § 1983)**
**(Individual Defendants)**

The actions of the individual Defendants as described above, including, *inter alia*, deliberately disregarding the harassment and physical abuse of Z.G. while knowing that it occurred due to his religious affiliation, violates Z.G.'s rights under the Fourteenth Amendment to the United States Constitution to equal protection under the law, causing damages.

## COUNT II

**(42 U.S.C. § 1983)**
**(Carver School Department)**

The actions of Defendant Carver School Department as described above, including, *inter alia*, failing to properly train its officials and teachers in identifying, responding to, and preventing religious-based harassment and bullying, failing to comply with its Bullying Prevention and Intervention Plan regarding Z.G., and failing to prevent religious-based harassment and bullying of Z.G., violates Z.G.'s rights under the Fourteenth Amendment to the United States Constitution to equal protection under the law, causing damages. This claim is pursued under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

WHEREFORE, Plaintiff prays this Court:

1. ORDER the Defendants to take all necessary and appropriate actions to prevent the religious harassment and bullying of Plaintiff;

2. ORDER the Defendants to comply with its Bullying Prevention and Intervention Plan in responding to the harassment and bullying of Plaintiff;

3. ORDER the Defendants to pay compensatory damages to Plaintiff for emotional distress;

4. Order the Defendants to pay punitive damages and reasonable attorneys' fees;

5. Any further relief as is just and necessary.

                Respectfully submitted,

                PLAINTIFF Z.G., a minor, by his mother Jennyfer Sordillo and father Robert Groezinger,

                By His Attorney,

                **/s/ Joseph L. Sulman**
                Joseph L. Sulman, BBO # 663635
                David I. Brody, BBO # 676984
                Law Office of Joseph L. Sulman, Esq.
                185 Devonshire Street, Suite 502
                Boston, Massachusetts 02110
                (617) 521-8600
                jsulman@sulmanlaw.com

July 30, 2013